UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
                                 :

EUSEBIO GONZALEZ,                :

                       Plaintiff,  :

                                :     08-CV-3595 (JPO) (HBP)

          -against-         :

                               :     ORDER ADOPTING
MICHAEL J. ASTRUE,         :     REPORT AND
COMMISSIONER OF SOCIAL SECURITY,  :     RECOMMENDATION

                               :

                     Defendant.  :

                               :
--------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: FEB 2 1 2012

J. PAUL OETKEN, District Judge:

     Plaintiff Eusebio Gonzalez initiated this action challenging the determination of the

defendant, the Commissioner of Social Security (the "Commissioner"), denying his claim for

Supplemental Security Income benefits under Title II of the Social Security Act, 42 U.S.C. §

405(g).

     Before the Court is the Commissioner's motion for judgment on the pleadings under Rule

12(c) of the Federal Rules of Civil Procedure.  The matter was referred to Magistrate Judge

Henry Pitman, who issued a Report and Recommendation that the Commissioner's motion be

granted and that the Commissioner's decision be affirmed (the "Report").[1]  No objections to the

Report have been received.

     When reviewing a report and recommendation by a magistrate judge, a district court

"may accept, reject, or modify, in whole or in part, the findings or recommendations made by the

magistrate judge." 28 U.S.C. § 636(b)(1).  "In a case such as this one, where no timely objection

has been made, a district court need only satisfy itself that there is no clear error on the face of

---

[1] The Report is attached to this Order as an exhibit.

the record." *Malavolta v. Commissioner of Social Sec.*, 2009 WL 1468601, *1 (S.D.N.Y. May 22, 2009) (citation omitted).

The Court has reviewed Magistrate Judge Pitman's very thorough and well-reasoned Report and finds no clear error on the face of the record.  Magistrate Judge Pitman's finding, that the ALJ's determination was supported by substantial evidence and was not based on any legal errors, is correct.

For the reasons stated, the Court ADOPTS the Report and Recommendation and GRANTS the Commissioner's motion for judgment on the pleadings.  The Clerk of the Court is respectfully directed to enter judgment on behalf of Defendant and to close the case.

Dated: New York, New York
      February 21, 2012

                                            J. PAUL OETKEN
                                 United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

EUSEBIO GONZALEZ,                        :

                    Plaintiff,           :

     -against-                           :        08 Civ. 3595 (JPO)(HBP)

MICHAEL J. ASTRUE,                       :        REPORT AND
Commissioner of Social Security                   RECOMMENDATION
                                         :
                    Defendant.
                                         :
----------------------------------X

          PITMAN, United States Magistrate Judge:

          TO THE HONORABLE J. PAUL OETKEN, United States

District Judge,


I.   Introduction

          Plaintiff, Eusebio Gonzalez, brings this action pursu-

ant to section 205(g) of the Social Security Act ("Act"), 42

U.S.C. § 405(g), seeking judicial review of a final decision of

the Commissioner of Social Security ("Commissioner") denying his

application for disability insurance benefits under Title II of

the Act.

          The Commissioner has moved for judgment on the plead-

ings pursuant to Rule 12(c) of the Federal Rules of Civil Proce-

dure (Docket Item 12).  For the reasons set forth below, I

respectfully recommend that the Commissioner's motion be granted.

II.  Background

    A.  Procedural Background

       Plaintiff filed an application for disability insurance

benefits ("DIB") on May 2, 2005[1] alleging that he had been dis-

abled since September 1, 1992 (Tr.[2] 16, 46-48, 53, 54-55).

Plaintiff claimed that he suffered from Hepatitis C, Syphilis,

and depression (Tr. 57).  The Social Security Administration

("SSA") denied plaintiff's application for benefits on October

25, 2005, finding that he was not disabled[3] (Tr. 32-34, 38, 41).

       Plaintiff timely requested (Tr. 37) and was granted a

hearing before an Administrative Law Judge ("ALJ") (Tr. 24, 25-

27).  ALJ Newton Greenberg conducted a hearing on May 30, 2007 at

---

[1]The administrative record indicates that plaintiff first
filed an application for DIB on May 2, 2005 (see Tr. 16, 53), but
thereafter amended his application to change his alleged onset
date from January 1, 1992 to September 1, 1992 (see Tr. 46-48,
49-51, 54-55).

[2]"Tr." refers to the administrative record that the
Commissioner filed as part of its answer, as required by 42
U.S.C. § 405(g).

[3]Plaintiff has been receiving Supplemental Security Income
("SSI") benefits since April 2000 on the basis of a
schizoaffective disorder (see Tr. 16, 33-34, 42, 53).
Plaintiff's SSI benefits are not at issue in this case.

which plaintiff was represented by Lincoln Saunders, a non-attorney representative[4] (see Tr. 16, 141-46).  Plaintiff testified at the hearing with the assistance of a Spanish interpreter (Tr. 141, 143).  In a decision dated September 4, 2007, the ALJ found that plaintiff had not been under a disability within the meaning of the Act from September 1, 1992 through December 31, 1992, the period during which plaintiff met the SSA's insured status requirement ("the Critical Period") (Tr. 16-21).  The ALJ's determination became the final decision of the Commissioner on January 9, 2008, when the Appeals Council of the SSA Office of Hearings and Appeals ("Appeals Council") denied plaintiff's request for review (Tr. 5-8).

Plaintiff commenced the present action by filing a complaint dated March 3, 2008 (Complaint, dated March 3, 2008 ("Compl."), (Docket Item 2)).  In his complaint, plaintiff claims that he suffers from "schizoaffective disorder, depression, heroin dependency maintained on methadone, Hepatitis C and diabetes" (Compl. at ¶ 4).  On September 1, 2010, the Commis-

---

[4]While the transcript of the administrative hearing lists plaintiff's representative as an "attorney" (see Tr. 141, 143), the ALJ's decision describes plaintiff's representative as a "non-attorney representative with Legal Services of New York" (see Tr. 16).  In light of this ambiguity, I shall assume that plaintiff's representative was not an attorney for purposes of resolving this motion.

sioner filed a motion for judgment on the pleadings pursuant to
Rule 12(c) of the Federal Rules of Civil Procedure (Notice of
Motion for Judgment on the Pleadings, dated September 1, 2010,
(Docket Item 12)).  Because plaintiff had not responded to the
motion, I issued an Order dated January 18, 2011 directing
plaintiff to submit any argument or other material in support of
his complaint or in opposition to the Commissioner's motion by
February 28, 2011 and advising that I would consider the motion
ripe for decision after that date (Docket Item 13).  Plaintiff
has not submitted any argument or other material, and, thus, the
Commissioner's motion remains unopposed.

    B.    Plaintiff's Social Background

         Plaintiff was born on July 8, 1955 (Tr. 46).  At the
time of the administrative hearing, he was fifty-two years old
(Tr. 143).  Plaintiff completed the fourth grade in Puerto Rico
(Tr. 63, 144).  He speaks Spanish, and only a minimal amount of
English (Tr. 56, 144).  He is unmarried (Tr. 46).  It does not
appear from the administrative record that he has any children
(see Tr. 46-48, 54-55, 56-65).

         Plaintiff was employed as a farm worker from 1983
through 1992, though only intermittently and for a couple months
at a time.  During this time period, he also worked as a security

4

officer at a jewelry store for six months.  Plaintiff was last
employed as a farm worker for four months in 1992 (Tr. 58).

Plaintiff's primary duties as a farm worker consisted
of manual labor, such as applying fertilizer to and harvesting
crops.  He used machines, tools, and equipment that required
technical knowledge and skills.  He did not do any writing,
complete any reports, or perform similar duties.  Plaintiff also
did not have any supervisory responsibilities (Tr. 58).

Plaintiff spent the majority of his workday kneeling,
crouching, reaching, and crawling.  Additionally, he spent some
time during his workday walking, stooping, reaching, lifting, and
carrying.  He frequently lifted objects weighing twenty-five
pounds, with the maximum weight lifted being one hundred pounds
or more (Tr. 58).

C.  Plaintiff's Medical Background

1.  Information Reported
by Plaintiff

Plaintiff reported that he suffered from Hepatitis C,
Syphilis, and depression.  He stated that he continued to work
until September 1, 1992 to "pay for [his] drug/alcohol habits,"
but that he had to stop working at that time because of constant
pain that he was experiencing, especially in his liver (Tr. 57).

5

Plaintiff also reported taking Zyprexa for his depression (Tr. 62).

At the time of the administrative hearing, plaintiff testified that he had a substance abuse problem with heroin and that he had attended five detoxification programs over the years. He also testified that he was being treated with methadone and attending a drug treatment program daily (Tr. 144-45).  Plaintiff's testimony at the administrative hearing was brief; his testimony spans only three pages of the administrative record (see Tr. 143-45).

### 2.   Treatment Records

The administrative record includes medical documentation of plaintiff's treatment from February 1999 through May 2007.  There are no medical records prior to February 1999.

### a.   Hunts Point Multi-Service Center

Plaintiff began receiving treatment from Hunts Point Multi-Service Center, Inc. ("Hunts Point") on February 2, 1999 (Tr. 93, 96).  His first physical examination at Hunts Point was "nonremarkable" (Tr. 130).  Additionally, plaintiff was "oriented," his speech was "clear," and his mental state was "alert"

6

(Tr. 130). As of August 22, 2005, plaintiff was attending Hunts Point's outpatient clinic five times per week for medication and counseling (Tr. 93).

Dr. Tak Yeun So, a physician at Hunts Point, completed a report concerning plaintiff's condition on September 13, 2005 (Tr. 96-102). In this report, Dr. So stated that plaintiff's treating diagnosis had been "heroin addiction," his last exam had been on June 7, 2004, and the frequency of his treatment was "daily" (Tr. 96). He further described plaintiff's current symptoms as consisting of "[a] craving for heroin" and "depression with auditory hallucination[s]" (Tr. 96). Dr. So also noted that plaintiff's treatment consisted of a "methadone maintenance program," and further, that he was receiving psychiatric treatment at "New Beginning's psychiatric clinic" (Tr. 97-98). Dr. So also reported that plaintiff had a "[h]istory of positive Hepatitis B and C[,] [though] his liver function test was essentially normal" (Tr. 97). Finally, Dr. So opined that plaintiff was "not ready to go to work at this time" (Tr. 100).

On May 8, 2007, a counselor at Hunts Point filled out a report concerning plaintiff's alcohol and substance abuse (Tr. 139-40). In this report, the counselor stated that plaintiff's substance abuse problem was in remission (Tr. 139). However, in a report dated May 23, 2007, Dr. So reported that while plain-

7

tiff's urine report was "essentially negative," it had been
positive for "opiate[s]" on December 26, 2006 and April 16, 2007
and positive for "cocaine" on December 12, 2006 and December 18,
2006 (Tr. 131).

          b.   New Beginnings
              <u>Mental Health Center</u>

      Plaintiff began receiving treatment from New
Beginnings, Mental Health Center ("New Beginnings") on March 25,
2004 and was first examined by Dr. David Molina on April 7, 2004
(<u>see</u> Tr. 73; 82-83, 115-16).  During the examination, plaintiff
told Dr. Molina that he had experienced emotional and behavioral
problems since he was a child and that he began using various
drug substances at age seventeen (Tr. 82, 115).  Plaintiff also
told Dr. Molina that he had attended five detoxification programs
over the years (Tr. 82).  Dr. Molina also noted that plaintiff
began receiving treatment from Hunts Point in 1999 (Tr. 82, 115).

      Dr. Molina then described plaintiff's complaints as
primarily including:  depression, paranoia, insomnia, decreased
concentration, decreased memory, and feelings of worthlessness
(Tr. 82, 115).  Upon examination, Dr. Molina noted that plaintiff
appeared depressed and his affect was "restricted" (Tr. 82, 115).
Plaintiff also exhibited signs of decreased concentration and

decreased memory, as well as displayed a "low average" intelli-
gence level (Tr. 83, 116).  However, plaintiff's speech was
"coherent" and "goal directed," and further, his "insight" and
"judgement [sic]" appeared fair (Tr. 82-83, 115-16).  Thus, Dr.
Molina diagnosed plaintiff as follows: Axis I - schizoaffective
disorder and polysubstance dependency; Axis II - deferred; Axis
III - status post-hernia repair; Axis IV - no psychosocial
stressors; and Axis V - a current global assessment of function-
ing ("GAF")[5] score of 55 (Tr. 83, 116).

In a report dated September 7, 2005, Dr. Molina con-
firmed that plaintiff was receiving psychotherapy once a week and
psychiatric services once a month (Tr. 73, 85).  Dr. Molina also
stated that plaintiff's treating diagnosis had been mental
illness and schizoaffective disorder (Tr. 73, 85).  The rest of
the report contains substantially the same findings as Dr.
Molina's report dated April 7, 2004 (see Tr. 73-79, 85-91).  The
only notable difference is that plaintiff's Axis IV diagnosis was

---

[5]The "GAF" scale ranges from 0-100 and represents a
clinician's judgment of an individual's overall level of
functioning.  See American Psychiatric Association, Diagnostic
and Statistical Manual of Mental Disorders 32 (4th ed. text rev.
2000).  A "GAF" score of 51-60 is defined as "[m]oderate symptoms
(e.g., flat affect and circumstantial speech, occasional panic
attacks) OR moderate difficulty in social, occupational, or
school functioning (e.g., few friends, conflicts with peers or
co-workers)."  Diagnostic and Statistical Manual of Mental
Disorders, supra, at 34.

altered from "no psychosocial stressors" to "poor social skills, lacks support" (compare Tr. 83, 116 and Tr. 74, 86) and Dr. Molina added that plaintiff's "adaption and overall functioning [are] unstable" (see Tr. 78, 90). Plaintiff's GAF score, however, remained the same (see Tr. 74, 86).

Dr. Molina submitted two more reports, a mental functional assessment dated January 18, 2006 (see Tr. 122-24) and a psychiatric/psychological report dated May 7, 2007 (see Tr. 133-38). In the January 2006 mental function assessment, Dr. Molina reported that plaintiff suffered "marked" limitations in understanding, remembering, and carrying out instructions, and further, that he suffered "marked" limitations in his ability to respond appropriately to supervision, co-workers, and work pressures in a work setting (Tr. 122-23). Additionally, Dr. Molina noted that plaintiff's judgment had become "poor," though he was still capable of managing his benefits (Tr. 123-24).

In the May 2007 psychiatric/psychological report, Dr. Molina reported that plaintiff suffered from a "severe and persistent mental illness [with a] marked cognitive impairment" and was no longer capable of managing his benefits (Tr. 133, 135). Specifically, plaintiff experienced "recurrent psychotic, depressive and manic episodes," his speech was "impoverished," his thought process was "circumstantial and sparse," and he had a

10

"low fund of general information" (Tr. 133). Further, Dr. Molina
opined that plaintiff was either unable to meet competitive
standards or had no useful ability to function in work-related
activities (see Tr. 137-38).

### 3. Medications

In plaintiff's disability report dated August 31, 2005,
he reported that he had been prescribed Zyprexa to treat his
depression (Tr. 62). The administrative record shows that
plaintiff was first prescribed Zyprexa in March 2004 (see Tr.
128) and that he continued taking that medication through May
2007 (see Tr. 74, 82-84, 86, 94-95, 103, 108-09, 114-17, 128,
133, 140). Additionally, at the administrative hearing, plain-
tiff testified that he was being treated with methadone for his
heroin addiction (Tr. 145).

Like the treatment records, the administrative record
includes medical documentation that plaintiff was prescribed
certain medications after the Critical Period. Plaintiff was
prescribed Ambien to treat his insomnia in March 2004 (see Tr.
128) and he continued taking that medication through May 2007
(see 74, 84, 86, 94-95, 103, 108-09, 114, 117, 128, 133, 140).
Plaintiff was also prescribed Vistaril to treat his insomnia in
December 2005 and he continued to take that medication through

11

May 2007 (see Tr. 128, 133, 140).  Finally, the administrative
record shows that plaintiff had been prescribed both Trazodone in
April 2004 (see Tr. 83, 116) and Zoloft in December 2005 (see Tr.
128) to treat his depression.  Plaintiff continued to take Zoloft
through May 2007 (see Tr. 133, 140).

### 4.  Consultative Physicians

Like the treatment records and medication records, the
administrative record includes medical documentation that plain-
tiff was examined by consultative physicians only after the
Critical Period.

Plaintiff was examined by Dr. Peter E. Graham, a
consulting internal medicine specialist, on September 21, 2005
(Tr. 103-05).  Plaintiff told Dr. Graham that he had a history of
heroin abuse, but that he had not used heroin for one year and he
was being treated with methadone (Tr. 103).  Plaintiff also
reported that he had been diagnosed with schizoaffective disorder
five years earlier and Hepatitis C two years earlier, though he
had never received anti-viral treatment for the hepatitis condi-
tion (Tr. 103).  Plaintiff further explained that he suffered
from depression and experienced auditory hallucinations (Tr.
103).

Upon examination, Dr. Graham opined that plaintiff's prognosis was "stable," and further, that his past medical history and current physical condition were largely unremarkable (see Tr. 103-05).  Additionally, Dr. Graham opined that plaintiff was "able to sit, stand, walk, lift, carry, handle objects, hear, speak and travel" (Tr. 105).  Based on the foregoing, Dr. Graham diagnosed plaintiff as follows:  (1) Hepatitis C, with "some spider angiomata present;" (2) schizoaffective disorder, "by history;" and (3) methadone maintenance (Tr. 105).

Plaintiff was also examined by Dr. A. Delachapelle, a consulting psychiatry specialist, on September 21, 2005 (Tr. 117-19).  Plaintiff told Dr. Delachapelle that he had a history of heroin abuse, but that he had not used heroin since June 2005 and he was being treated with methadone (Tr. 117).  Plaintiff also reported that he suffered from depression and experienced audi-tory hallucinations, as well as that he had been receiving psychiatric outpatient treatment for approximately four to five years (Tr. 117).  Plaintiff also stated that he had been diag-nosed with Hepatitis C (Tr. 118).

Upon examination, Dr. Delachapelle noted that plaintiff appeared "anxious and depressed" and that his speech was "coher-ent, somewhat rambling, disorganized and irrelevant" (Tr. 117).  He also noted that plaintiff's intellectual functioning was

13

"below average," his insight and judgment were "fair to poor,"
his memory was "impaired for recent and remote events," and his
concentration and attention levels were both "impaired" (Tr.
118).  Based on the foregoing, Dr. Delachapelle diagnosed plain-
tiff as follows: Axis I - psychotic disorder not otherwise
specified, heroin and alcohol abuse in remission; Axis II - mild
mental retardation; and Axis III - Hepatitis C (Tr. 117).  Dr.
Delachapelle further opined that plaintiff's prognosis was
"guarded," that he appeared unable to manage his funds, and that
he "has a decreased ability to understand, carry out, and remem-
ber instructions, [as well as] a decreased ability to respond
appropriately to supervision, coworkers and work pressures, in a
work setting" (Tr. 117-18).

       D.    Proceedings
           Before the ALJ

           At the administrative hearing before the ALJ on May 30,
2007, plaintiff testified to the following facts with the assis-
tance of a Spanish interpreter (Tr. 141, 143).  He stated that he
was fifty-two years old and was last employed as a farm worker on
Long Island.  He also stated that he had been a heroin addict for
approximately twenty-five years, but that he was then in a
"program" and "asking God to help [him] overcome this problem"

14

(Tr. 144).  Plaintiff also noted that he had attended several programs to treat his heroin addiction over the years (Tr. 144).

Plaintiff then testified that he completed the fourth grade in Puerto Rico and that he had "been in special groups, because I've always been behind in, in regards to learning.  And however, I do not know how to write or speak English" (Tr. 144). At this point, the ALJ noted for the record that plaintiff was in a "praying position" and inquired as to why (Tr. 144).  Plaintiff responded that he felt "nervous," he had not yet taken his medication, and he was anxious to attend his drug treatment program that afternoon (Tr. 144).  The ALJ then asked plaintiff whether he attended the drug treatment program and took methadone daily, and plaintiff responded that he did (Tr. 144-45).  When asked how long it had been since he had heroin, plaintiff re-sponded "I don't know, I don't know" (Tr. 145).  Plaintiff also testified that he suffered from Hepatitis C (Tr. 145).

Finally, plaintiff's non-attorney representative made a brief closing argument to the ALJ.  The non-attorney representa-tive stated that based on reports submitted by one of plaintiff's treating physicians,[6] "[t]here seem to be some psychotic fea-

---

[6]In the administrative hearing transcript, plaintiff's representative refers to "Dr. Melinez [ ] (Phonetic)" in his closing argument to the ALJ (Tr. 145).  This appears to be a

(continued...)

15

tures, and [this treating physician has] said that [plaintiff is] unable to meet any type of competitive standard" (Tr. 145).

The ALJ kept the administrative record open after the hearing to give plaintiff's non-attorney representative a full opportunity to submit additional medical evidence of plaintiff's disability prior to his last insured date (see Tr. 16).  However, on July 27, 2007, the non-attorney representative reported that there was "no additional medical evidence available beyond that which has already been produced in support of the claimant's application for disability" (see Tr. 16).

III. Analysis

    A.  Applicable Legal Principles

       1.  Standard of Review

The Court may set aside the final decision of the Commissioner[7] only if it is not supported by substantial evidence or if it is based upon an erroneous legal standard.  42 U.S.C.

---

[6](...continued)
reference to Dr. Molina, plaintiff's treating psychiatrist after the Critical Period.

[7]When the Appeals Council denies a plaintiff's request for review, the ALJ's decision becomes the final decision of the Commissioner.  Sims v. Apfel, 530 U.S. 103, 107-08 (2000).

§ 405(g); Burgess v. Astrue, 537 F.3d 117, 127-28 (2d Cir. 2008);

Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Tejada v.

Apfel, 167 F.3d 770, 773-74 (2d Cir. 1999); Bubnis v. Apfel, 150

F.3d 177, 181 (2d Cir. 1998).

The Court first reviews the Commissioner's decision for

compliance with the correct legal standards; only then does it

determine whether the Commissioner's conclusions were supported

by substantial evidence. Tejada v. Apfel, supra, 167 F.3d at

773-74; Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987);

Ellington v. Astrue, 641 F. Supp. 2d 322, 327-28 (S.D.N.Y. 2009)

(Marrero, D.J.). "Even if the Commissioner's decision is sup-

ported by substantial evidence, legal error alone can be enough

to overturn the ALJ's decision." Ellington v. Astrue, supra, 641

F. Supp. 2d at 328; accord Johnson v. Bowen, supra, 817 F.2d at

986. However, "where application of the correct legal principles

to the record could lead to only one conclusion, there is no need

to require agency reconsideration." Johnson v. Bowen, supra, 817

F.2d at 986.

"The Supreme Court has defined substantial evidence as

'more than a mere scintilla' and as 'such relevant evidence as a

reasonable mind might accept as adequate to support a conclu-

sion.'" Quinones v. Chater, 117 F.3d 29, 33 (2d Cir. 1997),

quoting Richardson v. Perales, 402 U.S. 389, 401 (1971). "Conse-

quently, where [there is] substantial evidence . . . this Court

may not substitute its own judgment as to the facts, even if a

different result could have been justifiably reached upon de novo

review." Beres v. Chater, No. CV-93-5279 (JG), 1996 WL 1088924

at *5 (E.D.N.Y. May 22, 1996); see also Valente v. Sec'y of

Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).   Thus,

"'[t]o determine on appeal whether an ALJ's findings are sup-

ported by substantial evidence, a reviewing court considers the

whole record, examining the evidence from both sides, because an

analysis of the substantiality of the evidence must also include

that which detracts from its weight.'"   Terwilliger v. Comm'r of

Soc. Sec., No. 3:06-CV-0149 (FJS/GHL), 2009 WL 2611267 at *2

(N.D.N.Y. Aug. 24, 2009), citing Williams v. Bowen, 859 F.2d 255,

258 (2d Cir. 1988).

        2.   Insured Status
             Requirement

        Under Title II of the Social Security Act, 42 U.S.C.

§§ 401 et seq., a claimant is entitled to disability benefits if

he or she is "insured for disability insurance benefits."   42

U.S.C. § 423(a)(1)(A), (c)(1); see also Acierno v. Barnhart

475 F.3d 77, 78 (2d Cir. 2007); Shaw v. Chater, supra, 221 F.3d

at 131; Arnone v. Bowen, 882 F.2d 34, 37 (2d Cir. 1989); Papp v.

18

Comm'r of Social Security, 05 Civ. 5695 (AJP), 2006 WL 1000397 at *12 (S.D.N.Y. Apr. 18, 2006) (Peck, M.J.) (Opinion & Order); Velez v. Barnhart, 03 Civ. 0778 (WHP)(JCF), 2004 WL 1464048 at *3 (S.D.N.Y. May 28, 2004) (Francis, M.J.) (Report & Recommendation).

"An applicant's 'insured status' is generally dependent upon a ratio of accumulated 'quarters of coverage' to total quarters." Arnone v. Bowen, supra, 882 F.2d at 37, citing 42 U.S.C. § 423(c)(1)(B) and 20 C.F.R. §§ 404.101(a), 404.130-404.133; see also Acierno v. Barnhart, supra, 475 F.3d at 78-79; Papp v. Comm'r of Social Security, supra, 2006 WL 1000397 at *12; Velez v. Barnhart, supra, 2004 WL 1464048 at *3.  "'Quarters of coverage' include quarters in which the applicant earned certain amounts of wages or self-employment income." Arnone v. Bowen, supra, 882 F.2d at 37, citing 20 C.F.R. §§ 404.101(b), 404.140-404.146; see also 42 U.S.C. § 413(a)-(d); Acierno v. Barnhart, supra, 475 F.3d at 79; Papp v. Comm'r of Social Security, supra, 2006 WL 1000397 at *12; Velez v. Barnhart, supra, 2004 WL 1464048 at *3.

Specifically, a claimant is insured for disability benefits in a given month if he "accumulate[s] 20 or more calendar 'quarters of coverage' within the 40 calendar quarters prior to filing for benefits." Acierno v. Barnhart, supra, 475 F.3d at

19

78-79, citing 42 U.S.C. § 423(c)(1)(B)(i); see also Arnone v. Bowen, supra, 882 F.2d at 37; Fleming v. Astrue, 06-CV-00020 (JG), 2010 WL 4554187 at *9 (E.D.N.Y. Nov. 2, 2010). "In other words, a claimant is insured . . . if he has earned income for a total of ten years, and for a total of five years within the last ten years.  The last date on which a claimant is insured . . . is known as his 'last date insured'."  Fleming v. Astrue, supra, 2010 WL 4554187 at *9; see also Arnone v. Bowen, supra, 882 F.2d at 37-38.

"Despite [a claimant's] failure to satisfy the earnings requirement at the time of his [or her] . . . application, [such claimant] might nevertheless have been 'insured for disability' . . . at that time if he [or she] qualified for a 'period of disability'."  Arnone v. Bowen, supra, 882 F.2d at 38, citing 42 U.S.C. § 416(i)(2)(A) and 20 C.F.R. § 404.320; see also Papp v. Comm'r of Social Security, supra, 2006 WL 1000397 at *12. Specifically, 20 C.F.R. § 404.320(a) provides:

> A period of disability is a continuous period of time during which you are disabled . . . . If we establish a period of disability for you, the months in that period of time will not be counted in figuring your average earnings.  If benefits payable on your earnings record would be denied or reduced because of a period of disability, the period of disability will not be taken into consideration.

20

20 C.F.R. § 404.320(a).  Thus, "[t]his provision could operate to exclude from the relevant calculation the years in which [the claimant] did not work."  Arnone v. Bowen, supra, 882 F.2d at 38; see also Papp v. Comm'r of Social Security, supra, 2006 WL 1000397 at *12.  However, "[a] 'period of disability' can only commence . . . while an applicant is 'fully insured'."  Arnone v. Bowen, supra, 882 F.2d at 38; see also Papp v. Comm'r of Social Security, supra, 2006 WL 1000397 at *12; Velez v. Barnhart, supra, 2004 WL 1464048 at *3.

     3.  Determination of
        Disability

    In addition to being "insured" for disability benefits, a claimant is entitled to disability benefits if he or she can establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see also Barnhart v. Walton, 535 U.S. 212, 217-22 (2002) (both impairment and inability to work must last twelve months).  The impairment must be

21

demonstrated by "medically acceptable clinical and laboratory

diagnostic techniques," 42 U.S.C. § 423(d)(3), and it must be

> of such severity that [the claimant] is not only unable
> to do his previous work but cannot, considering [the
> claimant's] age, education, and work experience, engage
> in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether
> such work exists in the immediate area in which [the
> claimant] lives, or whether a specific job vacancy
> exists for [the claimant], or whether [the claimant]
> would be hired if [the claimant] applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner must consider both objective and

subjective factors when assessing a disability claim, including:

(1) objective medical facts and clinical findings; (2) diagnoses

and medical opinions of examining physicians; (3) subjective

evidence of pain and disability to which the claimant and family

or others testify; and (4) the claimant's educational background,

age and work experience. Brown v. Apfel, 174 F.3d 59, 62 (2d

Cir. 1999); Rivera v. Schweiker, 717 F.2d 719, 723 (2d Cir.

1983).

"In evaluating disability claims, the [Commissioner] is

required to use a five-step sequence, promulgated in 20 C.F.R.

§§ 404.1520, 416.920." Bush v. Shalala, 94 F.3d 40, 44 (2d Cir.

1996).

> First, the Commissioner considers whether the claimant
> is currently engaged in substantial gainful activity.
> Where . . . the claimant is not so engaged, the Commis-

22

sioner next considers whether the claimant has a "se-
vere impairment" that significantly limits his physical
or mental ability to do basic work activities . . . .
Where the claimant does suffer a severe impairment, the
third inquiry is whether, based solely on medical
evidence, he has an impairment listed in Appendix 1 of
the regulations or equal to an impairment listed there
. . . . If a claimant has a listed impairment, the
Commissioner considers him disabled.  Where a claimant
does not have a listed impairment, the fourth inquiry
is whether, despite his severe impairment, the claimant
has the residual functional capacity to perform his
past work . . . . Finally, where the claimant is unable
to perform his past work, the Commissioner then deter-
mines whether there is other work which the claimant
could perform.

Balsamo v. Chater, 142 F.3d 75, 79-80 (2d Cir. 1998); see also

Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003); Butts v. Barnhart,

388 F.3d 377, 383 (2d Cir. 2004), amended in part on other

grounds on rehearing, 416 F.3d 101 (2d Cir. 2005); Green-Younger

v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Shaw v. Chater,

supra, 221 F.3d at 132; Brown v. Apfel, supra, 174 F.3d at 62;

Tejada v. Apfel, supra, 167 F.3d at 774; Rivera v. Schweiker,

supra, 717 F.2d at 722.

      Step four requires that the ALJ make a determination as

to the claimant's residual functional capacity.  See Sobolewski

v. Apfel, 985 F. Supp. 300, 308-09 (E.D.N.Y. 1997).  RFC is

defined in the applicable regulations as "the most [the claimant]

can still do despite [his] limitations." 20 C.F.R.

§§ 404.1545(a)(1), 416.945(a)(1).  To determine RFC, the ALJ

23

makes a "function by function assessment of the claimant's
ability to sit, stand, walk, lift, carry, push, pull, reach,
handle, stoop, or crouch . . . . " Sobolewski v. Apfel, supra,
985 F. Supp. at 309.  The results of this assessment determine
the claimant's ability to perform the exertional demands of
sustained work, and may be categorized as sedentary, light,
medium, heavy, or very heavy.  20 C.F.R. §§ 404.1567, 416.967;
see Rodriguez v. Apfel, 96 Civ. 8330 (JGK), 1998 WL 150981 at *7
n.7 (S.D.N.Y. Mar. 31, 1998) (Koeltl, D.J.).

       The claimant bears the initial burden of proving
disability with respect to the first four steps.  Burgess v.
Astrue, supra, 537 F.3d at 128; Green-Younger v. Barnhart, supra,
335 F.3d at 106; Balsamo v. Chater, supra, 142 F.3d at 80.  Once
the claimant has satisfied this burden, the burden shifts to the
Commissioner to prove the final step -- that the claimant's RFC
allows the claimant to perform some work other than the claim-
ant's past work.  Balsamo v. Chater, supra, 142 F.3d at 80; Bapp
v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986).

> In meeting [his] burden of proof on the fifth step of
> the sequential evaluation process described above, the
> Commissioner, under appropriate circumstances, may rely
> on the medical-vocational guidelines contained in 20
> C.F.R. Part 404, Subpart P, App. 2, commonly referred
> to as "the Grid."  The Grid takes into account the
> claimant's RFC in conjunction with the claimant's age,
> education and work experience.  Based on these factors,
> the Grid indicates whether the claimant can engage in

24

> any other substantial gainful work which exists in the
> national economy.

Gray v. Chater, 903 F. Supp. 293, 297-98 (N.D.N.Y. 1995) (Koeltl,
D.J.).

          4.   Development of
               the Record

        "It is the rule in the [Second] [C]ircuit that 'the
ALJ, unlike a judge in a trial, must [him]self affirmatively
develop the record' in light of 'the essentially non-adversarial
nature of a benefits proceeding.'"   Pratts v. Chater, 94 F.3d 34,
37 (2d Cir. 1996), quoting Echevarria v. Sec'y of Health & Human
Servs., 685 F.2d 751, 755 (2d Cir. 1982).

> Because a hearing on disability benefits is a non-
> adversarial proceeding, the ALJ generally has an affir-
> mative obligation to develop the administrative record.
> Echevarria v. Secretary of Health & Human Servs., 685
> F.2d 751, 755 (2d Cir. 1982).  This duty exists even
> when the claimant is represented by counsel . . . . The
> [Commissioner's] regulations describe this duty by
> stating that, "[b]efore we make a determination that
> you are not disabled, we will develop your complete
> medical history . . . [and] will make every reasonable
> effort to help you get medical reports from your own
> medical sources when you give us permission to request
> the reports."  20 C.F.R. § 404.1512(d).

Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996); see Halloran v.
Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) ("We have stated many
times that the ALJ generally has an affirmative obligation to
develop the administrative record . . . . ") (internal quotations

                             25

and citation omitted); Shaw v. Chater, supra, 221 F.3d at 131
("The ALJ has an obligation to develop the record in light of the
non-adversarial nature of the benefits proceedings, regardless of
whether the claimant is represented by counsel."); Tejada v.
Apfel, supra, 167 F.3d at 774 (same); Van Dien v. Barnhart, 04
Civ. 7259 (PKC), 2006 WL 785281 at *14 (S.D.N.Y. Mar. 24, 2006)
(Castel, D.J.) (same); Molina v. Barnhart, 04 Civ. 3201 (GEL),
2005 WL 2035959 at *6 (S.D.N.Y. Aug. 17, 2005) (Lynch, then D.J.,
now Cir. J.) (same).

     The regulations also state that "[w]hen the evidence we
receive from your treating physician . . . or other medical
source is inadequate for us to determine whether you are dis-
abled, . . . [w]e will first recontact your treating physician
. . . or other medical source to determine whether the additional
information we need is readily available."  20 C.F.R.
§ 404.1512(e); see also Perez v. Chater, supra, 77 F.3d at 47.

     Where the ALJ has failed to develop the record ade-
quately, remand to the Commissioner for further development is
appropriate.  See Pratts v. Chater, supra, 94 F.3d at 39.

     B.  The ALJ's Decision

     The ALJ first noted that plaintiff's application for
disability insurance benefits had been denied because there was

26

"insufficient evidence to establish that a disability existed prior to the last insured date of December 31, 1992" (Tr. 16). The ALJ then explained that the record was kept open after the administrative hearing to give plaintiff's non-attorney representative a full opportunity to submit additional medical documentation of disability prior to plaintiff's last insured date. However, on July 27, 2007, plaintiff's non-attorney representative reported to the ALJ that there was no additional medical evidence beyond that which had already been produced in support of plaintiff's application for disability insurance benefits (Tr. 16).

The ALJ next noted that plaintiff "last met the insured status requirements of the [Act] on December 31, 1992" (Tr. 19). Specifically, he stated:

> The claimant's earnings record reveals that the claimant has acquired sufficient quarters of coverage to remain insured through December 31, 1992, but not thereafter.[8] Thus, the claimant must establish disability on or before that date in order to be entitled to a period of disability and DIB.

(Tr. 19). The ALJ then applied the five-step analysis to plaintiff's appeal, relying on the medical evidence and plaintiff's testimony to determine that plaintiff was not disabled from

---

[8]Plaintiff's "DISCO DIB Insured Status Report," which sets forth the computation of plaintiff's last insured date, appears on pages 44-45 of the administrative record.

September 1, 1992, his alleged onset date, through December 31, 1992, his last insured date (Tr. 16-21).

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since his alleged onset date (Tr. 19).

At step two, the ALJ found that the "objective medical evidence fail[ed] to establish the existence of a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms" during the Critical Period (Tr. 19). Specifically, the ALJ stated that the available medical evidence established that plaintiff had normal mental and physi-cal findings in February 1999, with a decline in his condition occurring at some point after 2000. Thus, the medical evidence did not suggest any mental or physical abnormalities prior to 1999, which in turn, did not suggest any abnormalities during the Critical Period (Tr. 19-20). Based on this analysis, the ALJ concluded that he did not need to apply steps three through five to plaintiff's appeal (see Tr. 19-20).

28

C.    Analysis of the
      ALJ's Decision[9]

Plaintiff does not contest that he last met the earning requirements for insured status under the Act on December 31, 1992.  There is also no evidence or argument that plaintiff worked after his last insured date, and "therefore . . . [no evidence that he] accumulate[d] additional 'quarters of coverage' . . . . "  See Arnone v. Bowen, supra, 882 F.2d at 37-38.  Thus, plaintiff would ordinarily be ineligible for disability insurance benefits after December 31, 1992.[10]

Before considering whether the Commissioner's decision is supported by substantial evidence, I first review it for application of the correct legal standards.  See Tejada v. Apfel, supra, 167 F.3d at 773; Johnson v. Bowen, supra, 817 F.2d at 985; Ellington v. Astrue, supra, 641 F. Supp. 2d at 327-28.  I find

---

[9]Because plaintiff does not indicate that he objects to any specific aspects of the ALJ's decision, I shall consider each of the steps in the ALJ's analysis that supported the conclusion that plaintiff was not disabled.

[10]As explained above, a party seeking disability insurance benefits may qualify for the benefits if he is entitled to a "period of disability," which means that he experienced a continuous period during which he was under a disability. Plaintiff does not contend that he is entitled to a continuous period of disability.  Even if he had made such a contention, he still would need to demonstrate that he became disabled prior to his last insured date.  As I discuss more fully in the text, the administrative record does not support such a contention.

29

that the ALJ applied the correct legal standards to plaintiff's
appeal.  Specifically, the ALJ (1) applied the five-step sequen-
tial analysis required in all disability determinations, and (2)
applied Social Security Ruling 83-20 to plaintiff's appeal, which
deals with the procedures for establishing a disability onset
date (see Tr. 17-20).

     The ALJ also satisfied his affirmative obligation to
develop the administrative record.[11]  See Halloran v. Barnhart,
supra, 362 F.3d at 31; Shaw v. Chater, supra, 221 F.3d 131; Rosa
v. Callahan, supra, 168 F.3d at 79; Tejada v. Apfel, supra, 167
F.3d at 774; Echevarria v. Sec'y of Health & Human Servs., supra,
685 F.2d at 755.  First, the SSA requested and obtained medical
records concerning plaintiff's condition from the treating
physicians that plaintiff had identified on numerous occasions[12]

---

     [11]While the ALJ has an affirmative duty to develop the
administrative record whether or not plaintiff is represented by
counsel, this duty is "heightened" when the plaintiff appears pro
se.  See Echevarria v. Sec'y of Health & Human Servs., 685 F.2d
751, 755 (2d Cir. 1982); see also Cruz v. Sullivan, 912 F.2d 8,
11 (2d Cir. 1990); Bucci v. Apfel, 98 Civ. 2372 (RWS), 1999 WL
553787 at *5 n.5 (S.D.N.Y. July 29, 1999) (Sweet, D.J.).  As
noted above, there is an ambiguity in the administrative record
as to whether plaintiff was represented by an attorney or a non-
attorney representative at the administrative hearing (compare
Tr. 16 and Tr. 141, 143).  I conclude that the ALJ adequately
developed the record whether or not plaintiff's representative
was an attorney.

     [12]On plaintiff's disability report dated August 31, 2005, he
listed the following medical institutions:  (1) "New Beginnings
                                             (continued...)

(see Tr. 52, 53, 66-70, 71-80, 81-92, 93-95, 96-102, 106-16, 122-24, 129-32, 134-38, 139-40). Second, the ALJ kept the record open after the administrative hearing to give plaintiff's non-attorney representative an opportunity to submit additional medical evidence of disability prior to plaintiff's last insured date (see Tr. 16). On July 27, 2007, however, the non-attorney representative informed the ALJ "that there is no additional medical evidence available beyond that which has already been produced in support of the claimant's application for disability" (Tr. 16). Plaintiff does not claim otherwise. Thus, I shall assume that all relevant medical records have been obtained. Because it appears that the ALJ complied with the applicable legal standards, I turn to the question of whether the Commis-sioner's decision was supported by substantial evidence.

The ALJ found that while the available medical evidence established that plaintiff suffered from "schizoaffective disor-der, depression, heroin dependency maintained on methadone, and

---

[12](...continued)
Community Counseling;" (2) "Narco Freedom Inc;" and (3) "Hunts Point Multi-Service" (see Tr. 60-61). Respondent contends that "a review of the address for [Narco Freedom Inc.] . . . shows that it is an extension office for New Beginnings from whom the SSA requested and received records" (Memorandum of Law in Support of Defendant's Motion for Judgment on the Pleadings ("Resp't Mem."), (Docket Item 11), 11 n.8). Plaintiff does not contest respondent's conclusion, and I shall assume it to be correct for purposes of resolving this motion.

. . . Hepatitis C" since April 2000, it did not demonstrate the existence of a physical or mental impairment that was disabling prior to plaintiff's last insured date -- specifically, prior to December 31, 1992 (see Tr. 19).

In making this determination, the ALJ noted the following about the earliest medical evidence in the administrative record:

> . . . Dr. So's report [concerning plaintiff's condition in February 1999] expressly states that the claimant's mental examination showed that he was alert and oriented, and his speech was clear.  A physical examination revealed that his head, neck, lungs, abdomen, and extremities were nonremarkable.  Later, [on] August 16, 1999, a treating note from Rodney Rosenberg, M.D.[13] reflects that the claimant's [H]epatitis C was asymptomatic, and his asthma, [H]epatitis C, depression, and opiate dependence were all stable and/or controlled.  A chest X-ray was normal and showed no infiltrates.

(Tr. 19-20).  The ALJ then considered the rest of the medical evidence in the administrative record and stated:

> Since [1999], the claimant has been diagnosed with a psychotic disorder and [Dr. Molina], his treating psychiatrist since 2004, has diagnosed a schizoaffective disorder, bipolar type.  In several reports, Dr. Molina opines that the claimant has profound psychiatric symptoms which severely limit his ability to perform mental-related activities.  As well, Dr. So states in a September 2005 report that the

---

[13]The treating note dated August 16, 1999 does not appear in the administrative record, nor do any other medical records from Rodney Rosenberg, M.D.  Notwithstanding this, Dr. Rosenberg's findings are consistent with Dr. So's February 1999 report.

> claimant is unable to function in a work setting,
> although he defers to the claimant's psychiatrist for a
> specific assessment of [the claimant's] psychiatric
> limitations.

(Tr. 20).

Based on the foregoing, the ALJ found that the avail-
able medical evidence was consistent with "psychiatric evalua-
tions performed in 2000 and [plaintiff's SSI] disability determi-
nation [in April 2000 that he suffered from schizoaffective
disorder]."  However, the ALJ concluded that:

> [T]here is no evidence of any clinical findings,
> diagnosis, or treatment of a psychiatric (or other)
> impairment prior to the date last insured and,
> according to the claimant's representative, Dr. Molina
> declined to provide a retrospective opinion as to what
> impairments or limitations the claimant may have had
> prior to December 1992, particularly in light of the
> claimant's history of heroin abuse.  All other medical
> evidence in the record postdates the date last insured
> by several years.

(Tr. 20).

The ALJ also noted that while "a remote date of onset
may be reasonably inferred from the available medical evidence
[pursuant to Social Security Ruling 83-20]," such a date cannot
be inconsistent with the available medical evidence (Tr. 20).
Thus, because "the medical evidence [in plaintiff's case] shows
[that plaintiff] had normal mental and physical findings in
February 1999 . . . it cannot reasonably be inferred that [he]
had a disabling impairment six years previous to this evaluation"

33

(Tr. 20). Further, the ALJ noted that "[n]ot even the [plain-
tiff's] treating psychiatrist [Dr. Molina], who is in the best
position to assess the progression of the claimant's mental
impairment, is willing to make that leap" (Tr. 20).

The ALJ's determination that plaintiff was not disabled
prior to his last insured date is supported by substantial
evidence. Although there was no evidence bearing on plaintiff's
condition in December 1992, the medical evidence that was avail-
able showed that plaintiff was not disabled in 1999 and did not
arguably become disabled until September 2005.

The earliest medical evidence is from February 1999,
approximately six years after plaintiff's last insured date[14]
(see Tr. 93, 96; see also Tr. 19-20), and plaintiff's February
1999 examination actually undercuts plaintiff's claim that he was

---

[14]While not determinative of the issue, plaintiff's failure
to present any medical evidence concerning the period between
December 1992 and February 1999 is certainly relevant to whether
he was disabled prior to his last insured date. See Navan v.
Astrue, 303 F. App'x 18, 20 (2d Cir. 2008) ("[T]he ALJ
appropriately relied on the near absence of any medical records
[during the relevant time period] to find that [plaintiff's
claims] of total disability were undermined by his failure to
seek regular treatment for his allegedly disabling condition.").
Further, plaintiff's treating diagnosis at Hunts Point was
"heroin addiction." While plaintiff's substance abuse is not at
issue here, the Act provides that "[a]n individual shall not be
considered to be disabled for purposes of [disability insurance
benefits] if alcoholism or drug addiction would . . . be a
contributing factor material to the Commissioner's determination
that the individual is disabled." 42 U.S.C. § 423(d)(2)(c).

disabled prior to his last insured date.  Dr. So reported that
the February 1999 examination revealed: (1) plaintiff's head,
neck, lungs, heart, abdomen, and extremities were "nonremarkable-
," and (2) plaintiff was "oriented," his mental state was "alert-
," and his speech was "clear" (Tr. 130).  Thus, there was no
evidence of disability approximately six years after plaintiff's
last insured date.

        The next significant event disclosed by plaintiff's
medical records is the commencement of psychiatric treatment from
New Beginnings in March 2004 (see Tr. 82-83, 115-16).  At that
time, Dr. Molina reported that although plaintiff appeared
depressed and he exhibited signs of decreased concentration and
memory, the examination revealed: (1) plaintiff's speech was
"coherent" and "goal directed," and (2) plaintiff's "insight" and
"judgement [sic]" appeared fair (Tr. 82-83, 115-16).  Notably,
Dr. Molina reported a current GAF score of 55 and that plaintiff
experienced no psychosocial stressors at that time (Tr. 83, 116).
Although this report -- addressing a period more than eleven
years after plaintiff's last insured date -- shows that plaintiff
was experiencing difficulties, it does not establish that those
problems rose to the level of a disability.

With respect to plaintiff's Hepatitis, Dr. So noted in
September 2005 that plaintiff's liver function test was "essen-
tially normal" (Tr. 97).

It is only in September 2005 -- almost thirteen years
after plaintiff's last insured date -- that the available medical
evidence begins to show a decline in plaintiff's condition.[15]
For example, in September 2005, Dr. So opined that plaintiff was
"not ready to go to work at this time" due to an inability to
function in a work setting, though he deferred to plaintiff's
treating psychiatrist for an evaluation of plaintiff's specific
limitations (Tr. 98-101).  Also in September 2005, Dr. Molina
opined that plaintiff's "adaption and overall functioning [were]
unstable," and further, he altered plaintiff's Axis IV diagnosis
from "no psychosocial stressors" to "poor social skills, lacks
support" (Tr. 74, 78, 86, 90).  Additionally, Dr. Delachapelle's
prognosis for plaintiff was "guarded" in September 2005 (see Tr.

---

[15]In September 2005, Dr. Graham -- a consulting internal
medicine specialist -- opined that plaintiff's prognosis was
"stable" (Tr. 105), and further, that his past medical history
and his current physical condition were both largely unremarkable
(see Tr. 103-05).  Dr. Graham further opined that plaintiff could
"sit, stand, walk, lift, carry, handle objects, hear, speak and
travel" (see Tr. 105).  However, the focus of Dr. Graham's report
appears to be whether plaintiff had exertional limitations, as
opposed to non-exertional limitations.  Dr. Delachapelle, a
consulting psychiatry specialist who examined plaintiff on the
same day as Dr. Graham and whose findings are discussed in the
text, addressed whether plaintiff had non-exertional limitations.

118).  Specifically, Dr. Delachapelle found that plaintiff
suffered from a decreased ability to understand, carry out, and
remember instructions, as well as suffered from a decreased
ability to respond appropriately in a work setting (Tr. 117-18).
Dr. Delachapelle also opined that plaintiff was unable to manage
his funds (Tr. 119).

The medical evidence from 2006 and 2007 -- fourteen to
fifteen years after plaintiff's last insured date -- show the
greatest decline in plaintiff's condition.  In January 2006, Dr.
Molina reported that plaintiff suffered from "marked" limitations
in his ability to understand, remember, and carry out instruc-
tions, as well as in his ability to respond appropriately in a
work setting (Tr. 122-23).  In May 2007, Dr. Molina reported that
plaintiff suffered from a "severe and persistent mental illness
[with a] marked cognitive impairment" (Tr. 133).  Further, he
opined that plaintiff was either unable to meet competitive
standards or had no useful ability to function in work-related
activities (Tr. 137-38).

Finally, plaintiff self-reported to Dr. Graham that he
had been diagnosed with schizoaffective disorder in approximately
2000, as well as with Hepatitis C in approximately 2003 (see Tr.
103).  Plaintiff also self-reported to Dr. Delachapelle that he
had been receiving psychiatric treatment for depression and his

37

auditory hallucinations since approximately 2000 (see Tr. 117). These dates are consistent with the ALJ's finding that plaintiff suffered from various conditions as early as 2000, but that there was no objective medical evidence indicating that plaintiff suffered from a disabling condition prior to his last insured date.

Thus, unless one hypothesizes that plaintiff suffered from a disabling condition in 1992, made a recovery that left him essentially normal as of 1999, and that plaintiff then relapsed in 2005, there is no way that plaintiff was disabled as of his last insured date. Because there is no evidence to support the conclusion that plaintiff suffered from a disabling condition prior to 2005, this hypothesis is not supported by the adminis- trative record.

Although the mere absence of contemporaneous medical evidence of a disabling condition during the relevant time period does not necessarily preclude a finding of disability, see Arnone v. Bowen, supra, 882 F.2d at 39, the extant medical evidence must at least imply the existence of a disability during the relevant time period in order for a claimant to be found disabled. There simply is no such evidence in this case.

In conclusion, it may be the case that plaintiff suffered from a disabling condition as early as April 2000. However, because the earliest medical evidence in the record -- which is approximately six years after both plaintiff's alleged onset date and last insured date -- contains express findings that plaintiff's physical and mental examinations were unremarkable in early 1999, and further, a marked decline in plaintiff's condition only began in September 2005, there is substantial evidence to support the ALJ's determination that plaintiff was not disabled prior to his last insured date. Additionally, there is substantial evidence to support the ALJ's determination that inferring such an onset date would have been inconsistent with the available medical evidence.

IV.  Conclusion

For all the foregoing reasons, I respectfully recommend that the Commissioner's motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure be granted.

V.  OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1)(c)) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have

fourteen (14) days from receipt of this Report to file written
objections. See also Fed. R. Civ. P. 6(a). Such objections (and
responses thereto) shall be filed with the Clerk of the Court,
with courtesy copies delivered to the Chambers of the Honorable
J. Paul Oetken, United States District Judge, 500 Pearl Street,
Room 620, and to the Chambers of the undersigned, 500 Pearl
Street, Room 750, New York, New York 10007. Any requests for an
extension of time for filing objections must be directed to Judge
Oetken. FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS **WILL** RESULT
IN A WAIVER OF OBJECTIONS AND **WILL** PRECLUDE APPELLATE REVIEW.
Thomas v. Arn, 474 U.S. 140, 155 (1985); United States v. Male
Juvenile, 121 F.3d 34, 38 (2d Cir. 1997); IUE AFL-CIO Pension
Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993); Frank v.
Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Wesolek v. Canadair
Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714
F.2d 234, 237-238 (2d Cir. 1983).

Dated:  New York, New York
        November 22, 2011

                          Respectfully submitted,

                          _____
                          HENRY PITMAN
                          United States Magistrate Judge

40

Copies mailed to:

Mr. Eusebio Gonzalez
Apt. 4D
281 East 153rd Street
Bronx, New York 10451

John E. Gura, Jr., Esq.
Assistant United States Attorney
Southern District of New York
3rd Floor
86 Chambers Street
New York, New York 10007